[Cite as *In re M.C.*, 2024-Ohio-1243.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN RE:

CASE NO. 16-23-06

    M.C.,

ADJUDICATED DEPENDENT CHILD.

**O P I N I O N**

[COLLETTE B. - APPELLANT]

Appeal from Wyandot County Common Pleas Court
Juvenile Division
Trial Court No. C2212010

**Judgment Affirmed**

**Date of Decision:  April 1, 2024**

APPEARANCES:

    *Howard A. Elliott* **for Appellant**

    *Eric J. Figlewicz* **for Appellee**

**WILLAMOWKSI, P.J.**

{¶1} Appellant Collette B. ("Mother") brings this appeal from the judgment of the Court of Common Pleas of Wyandot County, Juvenile Division, granting residential parent status of M.C. to Dustin F. ("Father"). Mother claims on appeal that the trial court erred by failing to make findings of reasonable efforts as to the reunification plan and that the trial court's determination was not supported by the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} M.C. was born in 2011. On March 26, 2021, a complaint was filed by the Wyandot County Department of Job and Family Services ("the Agency") alleging that M.C. was an abused, neglected, and dependent child and M.C. was removed from the home. On April 29, 2021, Father was added to the case after his paternity was established. The trial court held an adjudication hearing on June 7, 2021, at which Mother and Father admitted that M.C. was a dependent child. The trial court subsequently ordered that M.C. remain in the temporary custody of the Agency. The case plan then required Mother to 1) find safe housing, 2) maintain employment, 3) visit with M.C., and 4) complete a mental health assessment. Father, who had no previous contact with M.C. was required by the case plan to visit with M.C. to establish a relationship.

{¶3} On December 16, 2021, Mother filed a motion for unsupervised visitation with M.C. At that time, Father had already been granted unsupervised

visits through the Agency. On January 12, 2022, Father filed a motion for legal custody of M.C. Mother then filed a response to Father's motion and a motion for reunification and that Father's visits be supervised. M.C. filed a motion for in-camera interview to be able to speak with the trial court regarding her wishes. Prior to the scheduled hearing on all pending motions, the parties reached an agreement. The agreement was that Mother would have unsupervised visits after two successful supervised visits. Father agreed to withdraw his motion for legal custody. Mother agreed to withdraw her motion for reunification and that Father's visits be supervised as child had been placed with Father by the Agency under protective supervision.

{¶4} On April 12, 2022, Father filed a new motion for legal custody. The basis for the motion was that M.C. had been placed in his home in February of 2022, and he believed it would be in M.C.'s best interest for her to remain there permanently. Mother filed another motion for reunification on May 6, 2022. Mother's motion alleged that M.C. should be placed with her because the police were called to Father's home when a neighbor reported inappropriate physical behavior by Father to M.C. Mother also alleged that her unsupervised visits with M.C. were going well and that she had the ability to provide a stable environment for M.C. The Agency filed a response to Mother's motion asking that it be denied. The Agency admitted that Father had intentionally tripped M.C. and that the police "admonished" Father about his behavior, but did not choose to press charges or

remove M.C. from the home. The Agency indicated that Father was educated on how to appropriately respond to M.C.'s physical outburst and was told that his behavior was inappropriate. The Agency did not wish to move M.C. from the home due to one isolated incident that did not result in harm and M.C. indicated she was comfortable in the home. Finally, the Agency did not wish to move M.C. before the psychological evaluation was completed because the child needed to remain in the home for two months before the evaluation could be conducted. Moving M.C. would again delay the assessment.

{¶5} The motions of Father and Mother were scheduled for a hearing on July 7, 2022. On June 29, 2022, the Agency supplemented its response to both motions asking the trial court to deny both motions. The Agency noted that Mother had made inappropriate statements to M.C. and was encouraging M.C. to act out in Father's home. The Agency also noted that Father had unilaterally stopped giving M.C. her prescribed medication and had allowed M.C. to miss counseling sessions. At the hearing, Mother and Father agreed to postpone their motions for a later date, reached an agreement as to child support, and agreed to additional parenting classes.

{¶6} On February 24, 2023, the Agency filed a motion to terminate temporary custody and to assign legal custody of M.C. to Father. Mother then filed a motion for reunification on February 27, 2023, requesting that the trial court award custody of M.C. to her. A hearing was held on these motions on June 9, 2023. Prior to the hearing, the trial court conducted an in camera interview of M.C. and

indicated that the wishes of the child would be considered. Before the hearing began, the Agency indicated that it was withdrawing its motion for Father to be granted legal custody, instead indicating that both parents were suitable for placement.

{¶7} The first witness presented by the Agency was Ronnie Cheney, the guardian ad litem ("GAL"). GAL testified that M.C. had transferred schools multiple times due to behavioral issues. GAL visited Father's home three or four times and observed M.C. in the home. M.C. usually appeared comfortable, but at the last visit (February 2023), M.C. did not. GAL indicated that she did not trust Father, so only went to the home when there was a third party available to accompany GAL to the visit. According to GAL, the bonding between Father and M.C. "fluctuated." GAL did not trust Father because of an incident where M.C. called the GAL to say M.C. was nervous to go to Father's house where many unknown relatives would be present. GAL then sent Father a text asking him if he could scale down the crowd because it was causing M.C. to be anxious. Father indicated that he would do so. The following Monday, Father called GAL's director and reported that GAL had "threatened" him, which was a false statement. The GAL was also concerned about allegations of abuse in Father's home. The GAL stated that M.C.'s mental health has stabilized while in Father's home. M.C. was also doing well academically while in Father's home. When asked about Mother,

GAL indicated that Mother is residing in a home with her husband. M.C. and Mother's husband appear comfortable with each other during visits.

{¶8} On cross-examination by Mother, GAL indicated that M.C. has issues with other children bullying at her current school. M.C. reacts to the bullying "in an extreme manner, such as threatening to hurt herself". Tr. 29-30. Father reacted appropriately to this and sought inpatient psychiatric help. GAL recommended that M.C. attend school where Mother resides to give M.C. a new start in junior high. GAL noted that at a visit in March 2023, Father spoke angrily to M.C. and refused to allow M.C. to speak privately with GAL and the caseworker. His stated reason for refusing was that he would not allow it "because of all the lies that [M.C.] tells people about him." Tr. 34. M.C. reported getting along "better" with Father's live-in girlfriend and appears to get along with the other children in the home. GAL also observed visits in Mother's home with her husband. GAL described Mother's husband as "an easygoing individual." Tr. 38. GAL had no concerns about his interactions with M.C. GAL testified that Mother and M.C. are well-bonded and M.C. appears to want to be in the same room with Mother. M.C. also appears to love Father. GAL recommends shared parenting with Mother named the residential parent for school purposes. If shared parenting is not possible, the GAL recommended placement with Mother. GAL also indicated that M.C.'s relationship with Father was improved when M.C. was spending more time in Mother's home

and was allowing Father to have a break. GAL testified that both Mother and Father had completed the case plan requirements.

{¶9} Father then cross-examined GAL. GAL admitted that she did not know for sure that Mother's school district would do a better job with M.C. than Father's district. GAL stated that Father and Mother were both taking steps to help M.C. with her behavioral needs. GAL admitted that she had more interactions with Mother than Father, but indicated that was because she did not trust Father and did not want to be alone with him. GAL also admitted that as of February 2023, she was recommending that M.C. remain with Father. However, her opinion changed after the subsequent visit where the GAL heard Father making negative comments about M.C. and Mother. GAL testified that M.C. had indicated that she wanted to live with Mother.

{¶10} Alicia Turner ("Turner") testified that she was the caseworker for M.C. from April of 2021 to March of 2023 when she left the Agency. M.C. and Father had no relationship prior to this case, so the Agency eased M.C. into the relationship by starting with supervised visits and progressing into legal custody. M.C. was excited to live with Father when she moved into his home. Turner testified that both Mother and Father had shown improvement during the case. Turner indicated that in her opinion, the final visit with GAL went well, though there was some tension between M.C. and Father. Turner's opinion as to schools was that M.C. should stay where she was because her interactions at the other

schools were not good and she seemed to have progressed at the current one. At the time Turner left the Agency, both parents had completed the case plan and the only issue remaining was to try and help them interact with each other better. Turner testified that by the end of her involvement in the case, both parents were appropriate placement options for M.C. Turner also indicated that M.C. indicated she wanted to live with Mother, but wanted to continue at her current school.

{¶11} Amanda Garrett ("Garrett") testified that she was the ongoing caseworker for M.C. since Turner left. Garrett testified that both parents had fulfilled the case plan requirements and they were just working on improving their communication and ability to work together to parent M.C. The Agency's position is that either parent would be appropriate for placement. Garrett stated that she believed shared parenting would be in the best interest of M.C. Garrett indicated that in conversations with M.C., M.C. indicated she wanted to live with Mother. This concluded the evidence presented by the Agency.

{¶12} Mother then presented her witnesses. Abby Ritchie ("Ritchie") testified that she was a neighbor of Father, but interacts with him rarely. On May 3, 2022, Ritchie was in her back yard when she heard yelling. Ritchie testified that she saw a man and a child in Father's backyard. The man was yelling at the child, then "the man hit the girl down to the ground and she went flat to the ground and then picked her up and then hit her again down to the ground." Tr. 100. Ritchie indicated that the man struck the child in the chest and face area. Ritchie identified

Father as the man she saw. Ritchie testified that the child did not appear injured, but she was concerned, so she called the police.

{¶13} Chief Dwight Dyer ("Dyer") testified that he is the chief of police of the Bloomville Police Department. Dyer responded to a call regarding an incident at Father's house on May 3, 2022. Although Father's clothing did not match that described by the witness, his general description matched and the clothes could easily have been changed. Father denied the witness's report and stated that it had not happened. Father did not want to allow Dyer to speak with M.C. and was saying "inappropriate" things to Dyer. Dyer defined "inappropriate" as Father speaking to him angrily and "pissed off that [Dyer] was there to begin with". Tr. 109. Father eventually let Dyer speak with M.C. after his girlfriend talked to him, but he was not doing so willingly. Father stated that M.C. accidentally tripped over his leg and he was only yelling at the child because she was being unruly. When Dyer questioned M.C., the child was not forthcoming because Father and his girlfriend were standing right there. M.C. "just paused, kind of made eye contact with her dad, with [the girlfriend], wouldn't really give me an answer." Dyer testified that based upon M.C.'s body language, he believed that something happened even though M.C. denied that anyone hit her. Originally, M.C. indicated that Father had deliberately tripped her, but then she backtracked to say it was an accident. Dyer testified that this raised red flags with him, so he asked Father to step away. As Father walked away, he was talking to M.C. about how she was not going to tell

Dyer what she did and how she had not wished him a happy birthday, only doing so later to get a piece of cake. Although Father walked away, the girlfriend stayed there. Dyer testified that he did not check M.C.'s chest for marks because the girlfriend said she would check, but "nothing came of that". Tr. 113. When Dyer mentioned that he would have to contact the Agency, Father would not give him the caseworker's name, but the girlfriend eventually did. Dyer indicated he was not able to speak with M.C. alone because Father would not allow it. Dyer testified that based upon his training and experience, he knew there was more to the story than what Father was saying. Before Dyer left Father's home, he told him that he did not have enough evidence to remove the child or to charge Father, but he was going to further pursue the matter due to what he did know.

**{¶14}** On cross-examination Dyer indicated that he did provide the information to the Agency along with his police report. No charges were filed and the Agency did not contact him to ask him to file charges. Dyer also testified that although he has arrested people for domestic violence, he did not do so in this case.

**{¶15}** Kevin M. ("Kevin") testified that he is the father of one of Mother's other children. Kevin and mother have shared parenting. According to Kevin, Mother communicates well with him about anything affecting their child.

**{¶16}** Richard B. ("Richard") testified that he was married to Mother and had been since September 2021. M.C. has her own room at their home. Richard testified that he interacts well with M.C. and they will talk about M.C.'s activities

and interests. Richard admitted that his prior girlfriend had claimed he threatened her and had obtained a civil protection order against him in 2008. Richard denied threatening her and stated that the woman had said it because she was mad at him for leaving her. The order expired in 2013 and no charges were ever filed from the incident. According to Richard, he was not added to the case plan. In his opinion, the relationship between Mother and M.C. was "really good" and that Mother appropriately corrected M.C. when she did something wrong. Richard testified that Mother was willing to work with Father and that he supported her doing so. When questioned by the GAL, Richard indicated that Mother has shown a positive improvement in her interactions with M.C. Richard told the trial court that M.C.'s siblings are present in the home approximately half a month and that M.C. enjoys being with her siblings.

{¶17} Mother admitted in her testimony that the living conditions at the beginning of the case were "horrible" and that the situation was very abusive with her boyfriend abusing her and M.C. observing it. Mother stated that she had fully complied with the case plan requirements and had completed everything. Father's only involvement with M.C. up to that point was seeing her a couple of times as a baby. Mother claimed that Father knew of M.C. because she told him, but made no effort to be involved in M.C.'s life. At her home, M.C. has her own room which is age appropriate. When Mother needs daycare while at work, M.C. goes to her sibling's home where the sibling's father watches them. M.C. likes going there and

has a prior relationship with the sibling's father. Mother testified that she takes M.C. to counseling when M.C. is with her and they are working on M.C.'s coping skills. Mother's relationship with M.C. has its "ups and downs" but is generally good with M.C. wanting to spend time with her. Over the course of the case plan, Mother and M.C.'s relationship has improved. Mother credits her counseling and parenting classes for teaching her skills to use in parenting. When it comes to discipline, Mother testified that M.C. was generally accepting of the limits placed on her. Mother has removed snapchat from M.C.'s tablet and limited her ability to download new apps, but allows M.C. to watch TikTok videos with her siblings. M.C. gets along with Richard and has a good bond with her siblings. Mother testified that M.C.'s relationship with Father is important and that she would encourage them to have a good relationship. Since it was summer, M.C. was switching homes every other week and Mother was making sure that M.C. could continue her 4-H activities when at Mother's home. Mother stated that she would like her communication with Father to be better, but also stated that they were working on it. Usually, they communicate through text messages, but will talk and work together if changes in schedules arise. Mother testified that she would like a shared parenting order, but would like M.C. to go to school in her district because M.C. reported being bullied at her present school. Based upon her research, the school district in which Mother resides has the resources to help M.C. and her

sibling will be going there as well. Mother wanted to be named the residential parent for school purposes.

{¶18} Father then presented the following witnesses. Dodie Conkel ("Conkel") is employed as a functional family therapist at the National Youth Advocate Program. Conkel provides therapy to M.C., Father, and the others who live in the home. Conkel indicated that their case was getting ready to close as it is a short-term therapy and the family has moved to the final phase. Conkel testified that Father was open to learning new skills. Conkel started working with the family after the Agency referred them. M.C. was diagnosed with oppositional defiant disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder. According to Conkel, M.C. is doing very well in Father's home and seems happy there.

{¶19} Father testified that M.C. had been living in his home since February 19, 2022. Father testified that his relationship with M.C. was "a roller coaster ride" with more good than bad. He was working with M.C. to stop her lying and to take responsibility for her actions. Father testified that he, and the other members of his household, have learned a lot from therapy. In addition to Father and M.C., his girlfriend and her three children live in the home. Father testified they have a "mini farm" with 30 chickens, over 25 rabbits, four goats, two cats, three dogs and a bearded dragon. The children, including M.C., take the animals to 4-H. In 2023, M.C. would be showing goats and rabbits for 4-H. M.C. seems to enjoy 4-H. In

the home, M.C. has her own room. Father testified that he knew Mother had given birth to M.C., but he did not believe he was her father until after the paternity test. Father admitted that when Mother introduced him to M.C. as an infant he did not think M.C. looked like his kid and Mother was told to leave. After paternity was established in the case, Father began visiting with M.C. and developed a relationship. Father testified that he and Mother were learning how to communicate and work together to parent M.C. Father testified that M.C. has developed a bond with his girlfriend's children. When he is unable to care for M.C., Father has family members in the area who will watch her. Father testified all of the children in his home do not attend the local school, but are open enrolled at another school, which was closer to their home. Father admitted that in May 2022, there was an incident in which he deliberately tripped and pushed M.C. because she had hit him. The neighbor saw this and called the police. Father admitted that he should not have done that and that he had learned better ways to handle things. Father testified that he wanted a shared parenting plan as well, but wished to be named the residential parent for the purpose of school. Father believes that M.C.'s current school is a good fit for M.C. because it already has the supports for M.C. established.

{¶20} At the conclusion of the evidence, the Agency indicated to the court that it had no preference as to which parent should be awarded custody as both were appropriate. Mother requested a shared parenting plan or in the alternative, that she be named the residential parent. Father also requested a shared parenting plan or in

the alternative that he be named the residential parent. M.C.'s counsel asked the trial court to take into consideration the wishes of M.C.

{¶21} On July 7, 2023, the trial court entered its ruling. The trial court noted that the Agency, Mother, Father, and the GAL all favored a shared parenting plan. However, the record supports that no motion for shared parenting and no shared parenting plan was filed with the trial court as required by R.C 3109.04.[1] The trial court noted that without the filing of a shared parenting plan by one or both parties, the trial court lacked the authority to order such a plan. Then the trial court determined that since both homes were appropriate, the trial court would name Father the residential parent to maintain the status quo. The trial court then ordered that M.C. would stay with Father from Monday to Friday during the school year and attend school at her current school. M.C. would go to Mother's home every weekend and Wednesday evenings during the school year. M.C. would also spend every spring break and one-half of the Christmas break with Mother. Once the school year ended, M.C. would alternate weeks in each of the homes. The trial court

---

[1] (1) If neither parent files a pleading or motion in accordance with division (G) of this section, if at least one parent files a pleading or motion under that division but no parent who filed a pleading or motion under that division also files a plan for shared parenting, or if at least one parent files both a pleading or motion and a shared parenting plan under that division but no plan for shared parenting is in the best interest of the children, the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children. R.C. 3109.04.

also indicated that the parties should work together to adjust the schedule as needed.[2]

Mother appealed from this judgment. On appeal, Mother raises the following assignments of error.

### First Assignment of Error

**The trial court engaged in reversible error by failing to make findings of reasonable efforts as to the child's parents on the reunification plan.**

### Second Assignment of Error

**The trial court abused its discretion by ignoring a number of matters of concern of the Father and his interaction with the minor child placed in his home as well as the substantial change in [Mother's] situation and as a result of the betterment of her parenting skills for completion of the reunification plan by not reuniting the child with her mother.**

*Reasonable Effort of the Agency*

{¶22} Mother claims in her first assignment of error that the trial court erred by failing to make a finding of reasonable efforts by the Agency in the reunification plan. "[A]t any hearing * * * at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether [the Agency ] that * * * removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the

---

[2] The schedule ordered was proposed by the parties themselves during their testimony with the only dispute being which home would be assigned for the purpose of education.

child to return safely home." R.C. 2151.419(A)(1). Here, the removal, or continued removal of M.C. from a parent was never at issue. Instead, the trial court was making an initial determination as to which parent should be named the residential parent. Thus, the trial court was not required to make the finding regarding the reasonable efforts of the Agency.

{¶23} Even though the trial court was not required to make the findings, a review of the record in this case shows that the trial court repeatedly found that the Agency had made reasonable efforts to reunify M.C. with her parents. In the final judgment entry the trial court found that the Agency "has made reasonable efforts to prevent the continued removal of the child from the home and to finalizing [sic] a permanency plan for the child, by reasonable care planning, identifying issues of concern and providing referrals for services to address all issues." Doc. 224 at 8. This finding is supported by the fact that M.C. was returned to a parent. The goal was reunification with a parent, not necessarily the same parent. The Agency presented testimony that Mother and Father had successfully utilized the services provided by the Agency, thus negating the concerns of the Agency and the basis for removing M.C. from the home. Mother argues that since she was not named the residential parent, she was not reunified. The Agency's position in the final hearing was that either parent was suitable for placement and even advocated for shared parenting. Once the Agency withdrew its motion to place the child with one parent and asked to have the case closed, the matter went from one in which the trial court

-17-

was determining whether to keep temporary custody with the Agency and extend the case, to an initial determination of custody for M.C. since paternity was now established. For these reasons, the first assignment of error is overruled.

*Determination of Residential Parent Status*

**{¶24}** In her second assignment of error, Mother is essentially arguing that the trial court abused its discretion by naming Father as the residential parent rather than her. As noted above, this was essentially the initial custody determination between the parents. During the pendency of the case plan, paternity was established for the first time. No prior court determination existed as to which parent would be named residential parent. Both parents requested to be named the residential parent, so the trial court was required to determine the best interest of the child. Determinations of initial custody awards are governed by R.C. 3109.04(B)(1).

> When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children. In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation.

R.C. 3109.04(B)(1). "Decisions concerning child custody matters rest within the sound discretion of the trial court." *Walker v. Walker*, 3d Dist. Marion No. 9-12-

15, 2013-Ohio-1496, ¶ 46. "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Barto v. Barto*, 3d Dist. Hancock No. 5–08–14, 2008–Ohio-5538, ¶ 25.

**{¶25}** The testimony in this case showed that either parent would be a suitable placement for M.C. The trial court found as such and noted that all the parties would like shared parenting, however no party had filed a shared parenting plan. Without the filing of the plan, the trial court lacked the authority to award shared parenting. Instead, the trial court named Father as the residential parent while giving Mother as much visitation as reasonable and leaving the parties with the freedom to work together to make adjustments.[3] In reaching its decision as to where M.C. should reside during the school week, the trial court decided to maintain the status quo since by all accounts M.C. was doing well at her current school. The determinations of the trial court are supported by the testimony of the witnesses. While there were some issues raised with both Father's and Mother's behavior, the issues were all in the past and both parties had successfully progressed to the point where the Agency felt either home would be appropriate. Given the evidence before the trial court, this Court does not find that the trial court abused its discretion. The second assignment of error is overruled.

---

[3] The trial court failed to address how the visitation schedule would affect the child support order already in place or address medical issues or tax issues. However these issues were not raised by the parties and will not be considered sua sponte for the first time on appeal

{¶26} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Wyandot County, Juvenile Division, is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

**/hls**